## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHARLA WHITE, f/k/a Charla Long, as the** | ) | |
| **Special Administratrix of the Estate of** | ) | |
| **Perrish Ni-Cole White,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-CV-0139-CVE-SH** |
| | ) | |
| **BRET BOWLING, in his official capacity** | ) | |
| **as Creek County Sheriff,** | ) | |
| **TURN KEY HEALTH CLINICS,** | ) | |
| **LLC, and DOES 1-5,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Defendants' Joint Application for Contempt and Motion to Exclude Witness (Dkt. # 129); Defendant Sheriff's Motion for Summary Judgment and Brief in Support (Dkt. # 132); Defendant Turn Key Health Clinics, LLC's Motion for Summary Judgment and Brief in Support (Dkt. # 140); Defendant Bowling's Motions in Limine and Brief in Support (Dkt. # 181); and Motion in Limine of Defendant Turn Key Health Clinics, LLC (Dkt. # 183). This case concerns the death of Perrish Ni-Cole White while he was incarcerated at the Creek County Jail (the Jail). Bret Bowling is the Sheriff of Creek County and he is responsible for supervising the Jail, and Turn Key Health Clinics, LLC (Turn Key) is the medical provider for

---

[1] Plaintiff's counsel interchangeably refers to the decedent as "Perrish" and "Perish" throughout his filings in this case, and the evidentiary materials provided by the parties also use alternate spellings of the decedent's name. See Dkt. # 1-2 (original petition refers to "Perrish"); Dkt. # 14, at 1 (amended complaint spells name of decedent as "Perish"); Dkt. # 140-1 (medical records refer to "Perrish"); Dkt. # 140-17 (official death certificate spells name as Perish). The Court will spell the name as "Perrish" to maintain consistency with the docket sheet, but the Court makes no finding as to the correct spelling of the decedent's first name.

inmates in custody at the Jail. Bowling and Turn Key argue that White received constitutionally adequate medical care while he was incarcerated at the Jail, and plaintiff has failed to produce evidence that White's death caused by the denial of medical care at the Jail. Turn Key also argues that plaintiff has no evidence that Turn Key acted pursuant to an official policy or custom that was the moving force behind the denial of appropriate medical care to the deceased. Plaintiff contends that White contracted COVID-19 at the Jail and was not timely referred to a hospital, and plaintiff claims that White died as a result of the delay in referring him for medical treatment. Dkt. # 159, at 5. Plaintiff also claims that the Jail's medical facility was operated by nurses acting outside the scope of their legally authorized duties, and that Turn Key and Bowling are liable for providing constitutionally deficient medial care.

## I.

On June 1, 2021, White was booked into the Jail, and he completed a medical intake form as part of the booking process. Dkt. # 140-1, at 18-20. White reported that he had asthma and that he was allergic to strawberries, but he stated that he was not currently taking medication for any medical condition. Id. White had been diagnosed with bronchitis and asthma as a child, but he had not taken any medication "for years" for these conditions. Dkt. # 140-11, at 7. Turn Key staff also completed a Coronavirus Screening form as part the intake process. Dkt. # 140, at 19. White had not received a COVID-19 vaccination before he was incarcerated in June 2021, and there is no evidence in the summary judgment record as to whether White would have consented to receive a vaccine while he was incarcerated. Dkt. # 140-11, at 8. Turn Key could not request COVID-19 vaccines from the county health department until a certain number of inmates consented to receive

the vaccine, and the Jail never reached a sufficient level of consenting inmates to obtain the vaccines from the county health department.  Dkt. # 140-8, at 14-16.

On July 12, 2021, White complained to detention staff that he had a headache, and he was taken to the medical office to be seen by a nurse.  Id. at 3.  However, he returned to his cell after he waited approximately 30 to 40 minutes and had not been seen by medical staff.  Id. at 3-4.  Plaintiff began calling the Jail requesting that White receive medical attention, and plaintiff left a voicemail message for medical staff concerning White's condition.  Dkt. # 159-5, at 2-3.  However, medical staff claim that they never received the messages or checked the voicemail for the medical office. Dkt. # 140-8, at 11; Dkt. # 140-22, at 5. On July 13, 2021, White told a detention officer, Michelle Stovall, that he had nasal pressure and felt like he had a sinus infection, and she took him to the medical unit.  Dkt. # 140-10, 8-9.  Taylor O'Connor, a licensed practical nurse (LPN), evaluated White and noted that he had a history of chronic asthma and sinus infections. Dkt. # 140-9, at 10-11. O'Connor observed that White had a fever, red and itchy eyes, a stuffy nose, a productive cough, and she also reported crackles in the right and left lung and drainage coming from White's ears. Dkt. # 159-7, at 6-7.  She ordered that White be given Zyrtec, guaifenesin, and acetaminophen for pain and elevated temperature.  Id. at 7-8.  The medical records show that O'Connor selected a predetermined treatment protocol for upper respiratory congestion.  Dkt. # 140-9, at 16; Dkt. # 159-7, at 8.  The protocols for treatment of inmates were developed by a physician, William Cooper, M.D., who served as the chief medical officer for Turn Key.  Dkt. # 159-8, at 33-37.  O'Connor could have selected a protocol for COVID-19, and Dr. Cooper acknowledged that selecting the wrong protocol could possibly affect a patient's outcome.  Id. at 40-41.  Based on O'Connor's evaluation of White, she determined that he did not meet the criteria for transfer to a hospital, nor

did she refer White to a medical provider for further evaluation. Dkt. # 140-9, at 20-21. O'Connor did not administer a COVID-19 test to White on July 13, 2021, and Turn Key claims that COVID-19 tests were used sparingly due to lack of availability of tests. The higher level medical provider assigned to the Jail, Josephine Otoo, an advanced practice registered nurse (APRN), testified that she should have been contacted to evaluate White based on the symptoms listed in his medical records on July 13, 2021. Dkt. # 159-2, at 24-25.

The parties dispute whether White requested additional evaluations by medical staff before July 17, 2021. Turn Key cites its medical records to support its argument that White did not ask to be seen by medical staff after his evaluation by O'Connor on July 13, 2021, until he requested additional medication on July 17, 2021. Dkt. # 140, at 13; Dkt. # 140-1, at 1-21. Following O'Connor's evaluation, Turn Key asserts that White did not request additional medical care until July 17, 2021, when he notified Amity Williams, a nurse conducting a routine medication pass, that his symptoms had not improved and he needed additional medication. Dkt. # 140-10, at 11. Williams assessed White as complaining of sore throat, body aches, and drenching sweats that had continued for five days, and she claims that she administered tests for flu and COVID-19. Dkt. # 140-8, at 4-5; Dkt: # 140-12. The entry in White's medical records show that his flu and COVID-19 tests were negative. Dkt. # 140-12. However, Williams states that she recorded the information in the wrong patient's medical chart, and she claims that she did not learn of her mistake until July 30, 2021.[2] Dkt. # 140-8, at 5. Stovall testified in her deposition that she did not believe that White was

---

[2]    Plaintiff argues that evidence suggests that Williams did not actually evaluate White at all on July 17, 2021 due to the post-dated medical record entries, and she asks the Court to find that Williams did not administer flu and COVID-19 tests to White on July 17, 2021. Dkt. # 159, at 14-15. Williams testified in her deposition that she initially recorded White's information in the wrong patient's medical chart, and she did not realize her mistake until

suffering from a serious medical issue on July 17, 2021, when she walked him to the medical unit without assistance.   Dkt. # 140-10, at 18-19.   White continued to receive over-the-counter medication, including cetirizine, guaifenesin, and ibuprofen on July 18 and 19, 2021.  Dkt. # 14-1, at 21-22.

On July 19, 2021 around 4 p.m., jail staff notified Williams that White was suffering from chest pain, shortness of breath, dizziness, and he was having difficulty walking.  Dkt. # 140, at 15; Dkt. # 159, at 17.  Williams requested that jail staff bring White to the medical unit to be seen by a nurse, and White was transported to the medical unit in a wheelchair.  Id.  Williams initially noted that White appeared to be weak, and he was complaining of shortness of breath and dizziness.   Dkt. # 140-1, at 4.  Williams took White's vital signs and found that he had a low level of oxygen saturation, and Williams contacted Karen Gates, an APRN, about White's condition.  Dkt. # 140, at 16; Dkt. # 159, at 17.  Gates ordered that White be transported to a hospital, and White was taken to the Oklahoma State University Medical Center (OSUMC) in Tulsa, Oklahoma just after 5 p.m. on July 19, 2021.  Williams did not contemporaneously make entries into White's medical records, and she admits that she did not record these events in White's medical records until July 30, 2021. Dkt. # 160-6, at 8-11.

_____

July 30, 2021.  Dkt. # 159-6, at 8-11.  This is primarily an issue of witness credibility that is not appropriate for resolution on a motion for summary judgment, but that does not mean that the Court will wholly disregard Williams' deposition testimony.  For the purpose of ruling on the motion for summary judgment, the Court will assume that White did not receive flu or COVID-19 tests on July 17, 2021, but there is sufficient evidence to support Williams' deposition testimony that she did evaluate White on that date.  See Dkt. # 140-10 (detention officer Michelle Stovall testified in her deposition that she took White to the medical unit on July 17, 2021 because White was complaining that he was no longer receiving medication).

White checked into OSUMC at 5:18 p.m. on July 19, 2021 and he was initially taken to the emergency room for an examination. Dkt. # 141-14, at 1-2. White initially tested negative for COVID-19, but the attending physician ordered a second test due the nature of White's symptoms. Id. at 5. The second test was positive for COVID-19, and White was given supplemental oxygen to increase his blood-oxygen saturation. Id. at 5-6. White relapsed to a state of respiratory distress when he was taken off supplemental oxygen, and the attending physician determined that hospitalization for respiratory distress and COVID-19 was warranted. Id. at 4-5. Medical records show that White was diagnosed with respiratory failure, COVID-19, and acute kidney injury. Id. at 6. Plaintiff's expert, Todd Wilcox, M.D., testified in his deposition that White was not in "critical condition" upon his arrival at OSUMC, and White's medical records show that he was in stable condition while he was receiving supplemental oxygen. Dkt. # 141-5, at 162; Dkt. # 141-14, at 4-5. Around 8 p.m. on July 20, 2021, medical staff evaluated White and noted that he was sitting up in bed and eating. Dkt. # 141-14, at 20. White continued to have "coarse breathing sounds," but his air was moving well and he was not wheezing. Id. White denied that he was suffering from shortness of breath and his vital signs were stable. Id.

At 6:49 p.m. on July 21, 2021, White began to experience severe chest pain and testing showed that White had a troponin level of 2.37.[3] Id. at 18. This suggested that White could be having a heart attack and the physician ordered an EKG. Id. The physician attempted to contact the

---

[3]     Troponin is a protein that ordinarily stays inside the walls of the heart muscles and exists in the bloodstream in very low amounts. However, troponin leaks into the bloodstream when there has been damage to the heart muscles, and higher levels of troponin in the bloodstream are used as an indicator of cardiac distress. TROPONIN, ncbi.nlm.nih.gov/books/NBK507805 (description of Troponin from the National Library of Medicine maintained by the National Institute of Health).

6

cardiology department at OSUMC, but the telephone operator could not provide a contact number for the cardiologist on call. Id. By 12:13 a.m. on July 22, 2021, White's troponin level had increased to 5.66 and the attending physician again attempted to contact a cardiologist. Id. Medical staff successfully made contact with the cardiologist on call, and the cardiologist agreed that the EKG results were "very concerning for a STEMI (ST Elevation Myocardial Infarction)." Id. By 3:33 a.m., a new EKG showed that White's condition was worsening, and the cardiologist finally arrived at 3:51 a.m. to examine White. Id. at 19. The cardiologist initiated a code STEMI and White was taken to the catheterization lab at 4:38 a.m. Id. White's right coronary artery was 80 percent occluded and his left ventricle was also severely inhibited. Id. at 23. Turn Key's expert, Kyle Brownback, M.D., opines that the acceptable time frame for medical intervention and stent placement from the detection of a STEMI is 90 minutes and, in this case, OSUMC delayed over several hours before beginning appropriate medical intervention. Dkt. # 141-2, at 5 (Dr. Brownback stated that "[f]rom the time that Mr. White was found to have an ST-segment elevation myocardial infarction until the time of his percutaneous intervention and stent placement, over 5 hours elapsed"). Plaintiff's expert, Dr. Wilcox, does not dispute that the length of time before OSUMC initiated treatment for White's heart condition was excessive. Dkt. # 141-5, at 158-59.

On July 25, 2021, testing showed that White had an elevated white blood cell count, and the results of a chest CT exam indicated that White may have bacterial pneumonia. Dkt. # 141-2, at 5; Dkt. # 141-14, at 29. OSUMC took a sputum culture and the results showed an abnormal gram stain and other evidence suggesting the presence of harmful bacteria. Dkt. # 141-14, at 14-16. However, OSUMC did not begin treating White with antibiotics until July 28, 2021 after additional testing conclusively revealed the presence of methicillin resistant staph aureus (MRSA). Id. at 21-22. Dr.

Brownback notes that plaintiff's respiratory problems worsened between July 25 and July 28, 2021, and White was developing sepsis due to the delay in antibiotic treatment for his staph infection. Dkt. # 141-2, at 5-6. While OSUMC was awaiting the results of White's bacterial cultures, he was transferred to the intensive care unit (ICU) for a higher level of care due to chest pain, tachypnea, and worsening hypoxia. Id. at 13. OSUMC staff incorrectly placed a hemodialysis catheter in White's carotid artery, instead of his jugular vein, and OSUMC staff attempted to place a second catheter in White's right femoral vein. Id. at 11. The second catheter caused a hematoma to develop in White's right groin area, and a third catheter was successfully placed in White's left groin area. Id. OSUMC medical staff determined that the catheter that had been improperly placed in White's carotid artery needed to be surgically removed to decrease the risk of stroke, but White was a poor candidate for surgery due to his "worsening acidosis and clinical picture." Id. at 12. Surgery to remove the catheter in White's carotid artery was ultimately recommended, but White's medical records do not show that the surgery actually took place. Id.

Transfer to the ICU initially helped to stabilize White's condition, but White's blood pressure and kidney function worsened and more extreme measures were required to stabilize White. Id. at 8. More aggressive interventions were required to keep White alive, but he eventually died on July 30, 2021. Id. The medical examiner's report lists COVID-19, cardiovascular disease, and obesity as contributing factors in White's death, but the official cause of death is identified as COVID-19. Dkt. # 160-19, at 1.

Plaintiff Charla White, the special administrator of White's estate, filed this case in Tulsa County District Court alleging claims under the Rehabilitation Act, 42 U.S.C. § 1983, and Oklahoma's wrongful death statute. Defendants removed the case to this Court based on federal

question jurisdiction.  Plaintiff filed an amended complaint alleging only § 1983 claims against Bowling, Turn Key, Michelle Stovall, Todd Gene Inks, and Cynthia Thompson.[4]  Plaintiff alleges that defendants acted with deliberate indifference to White's obvious need for medical care, and she claims that defendants' conduct violated White's rights under the Eighth and Fourteenth Amendments.  Plaintiff voluntarily dismissed her claims against Stovall, Inks, and Thompson.  Dkt. # 177.  The remaining claims are plaintiff's § 1983 claims against Turn Key and the Sheriff.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the

---

[4]      Stovall, Inks, and Thompson are detention officers who were employed by the Jail.  Dkt. # 14, at 2-3.  Plaintiff claimed that they were responsible for ensuring that White received adequate medical care while he was incarcerated.  Id.  The original petition also named Cody Smith, the Jail administrator, as a defendant, but plaintiff chose not to bring claims against Smith in her amended complaint and Smith was terminated as a party.

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Defendants argue that plaintiff has failed to produce evidence distinguishing between potential causes of White's death, and plaintiff's failure to provide expert testimony as to medical causation is a sufficient basis to dispose of plaintiff's § 1983 claims against Bowling and Turn Key. Defendants also argue that plaintiff has failed to show that a constitutional violation occurred as the result of an official policy or custom, rather than simply the negligent acts of individual employees of Turn Key or the Jail. Plaintiff responds that it is undisputed that COVID-19 was the cause of White's death, and defendants' arguments that negligent medical care provided by OSUMC caused or substantially contributed to White's death have no bearing on plaintiff's § 1983 claims. Plaintiff further argues that Turn Key had a policy of failing to provide COVID-19 testing and vaccinations, failing to staff facilities with trained medical professionals, and denying transfers to a higher level of care to maximize its profits rather than provide necessary medical care to inmates.

10

## A.

Turn Key argues that plaintiff's complaints of constitutionally inadequate medical care at the Jail and the negligent medical care provided to White by OSUMC are potentially distinct and independent causes of White's death, and plaintiff must provide expert testimony as to medical causation in order to show that the alleged delay in transferring White to the hospital caused White's death.  Dkt. # 140, at 22-26.  Plaintiff raises three arguments to defendants' causation issue in an attempt to show that she is not required to come forward with expert testimony on the issue of medical causation.  First, plaintiff argues that the issue of causation must be viewed in the context of her § 1983 claims, and plaintiff seems to be arguing that the Court should focus on the alleged delay in transferring White to the hospital, rather than the medical care he received at OSUMC, as the cause of White's death.  Dkt. # 159, at 26.  Second, plaintiff claims that defendants' argument is based on a poorly-worded question asked of plaintiff's expert witness, Dr. Wilcox, during Wilcox's deposition.[5]  Id. at 27.  Finally, plaintiff argues that the delay in transferring White to the hospital caused White's condition to deteriorate, and the denial of medical care that results in

---

[5]    Plaintiff's correctional healthcare expert, Dr. Wilcox, testified in his deposition that he could not state with a high degree of certainty whether White would have survived had Turn Key transferred White to a hospital prior to July 19, 2021.  Dkt. # 141-5, at 157-58.  Plaintiff complains that defense counsel asked a compound question and she faults defense counsel for failing to inquire more specifically if an earlier medical intervention would have resulted in a more favorable outcome for White.  Dkt. # 159, at 27.  The question posed to Wilcox and his answer were sufficiently clear, and Wilcox was merely suggesting that he could not opine with any high degree of certainty that White's outcome would have been different with an earlier hospitalization due to the nature of COVID-19.  The Court construes Wilcox's answer more as a clarification of his opinions rather than as a concession that transferring White to hospital prior to July 19, 2021 would not have changed White's outcome.  Plaintiff's argument concerning the question posed to Dr. Wilcox by defense counsel is not an independent basis to reject defendant's medical causation expert.

unnecessary pain or the worsening of an inmate's condition is sufficient to support a § 1983 deliberate indifference claim. Id. at 28.

The facts of this case clearly present multiple possible causes for White's death, and plaintiff has not attempted to offer evidence concerning medical causation.[6] Instead, plaintiff argues that it is the underlying policy or custom of providing constitutionally inadequate medical care that is relevant to her § 1983 claims, rather than any medical care provided by OSUMC, that should be considered by the Court. Dkt. # 159, at 26 (citing Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs, 962 F. 3d 1204, 1241 (10th Cir. 2020)). This argument applies to plaintiff's claim for the time prior to White's hospitalization, but plaintiff is essentially asking the Court to ignore clear evidence in the record suggesting that White ultimately died because of the negligent medical care provided by OSUMC. The evidence shows that White was having severe respiratory distress upon admission to the hospital on July 19, 2021, and he later tested positive for COVID-19. However, medical staff provided White supplemental oxygen and his condition substantially stabilized until July 21, 2021. At 6:49 p.m. on July 21, 2021, White began to complain of chest pain and the attending physician determined that White needed to be seen by a cardiologist. However, a cardiologist did not arrive until after 3 a.m. the following morning and White was not taken to the catherization lab until after 4:30 a.m. Defendants' expert, Dr. Brownback, opines that a clinically acceptable time frame from

---

[6]    Plaintiff intended to offer the testimony of Michael McMunn, a registered nurse and nurse practitioner, to support her argument that there was a "fatal delay in the diagnosis, care, and treatment of [White]." Dkt. # 138-3, at 4. Turn Key filed a motion to exclude McMunn's medical causation opinions on the ground that he lacked the necessary qualifications and that his opinions on this issue were unreliable. Dkt. # 138. Plaintiff failed to respond to the motion and she later clarified that she did not object to the exclusion of McMunn's medical causation opinions. Dkt. # 187. Based on the lack of objection, the Court granted Turn Key's motion to exclude McMunn's medical causation opinions. Id.

the detection of a STEMI to revascularization should not exceed 90 minutes, and any delay beyond 90 minutes "contributed to [White] having worse cardiac function and increased his risk of death." Dkt. # 141-2, at 5.  Plaintiff has not offered expert testimony concerning the effect of the delay in providing treatment to White for the STEMI, but his expert, Dr. Wilcox, agrees that the delay in treating White's STEMI was inappropriate.  Dkt. # 141-5, at 159.  White subsequently contracted MRSA and was likely developing sepsis, and OSUMC delayed in initiating antibiotics to treat White's infection.  Dr. Brownback states that the failure to timely provide antibiotics to White contributed to his "poor outcome," and plaintiff has offered no expert evidence concerning this aspect of White's treatment at OSUMC.  Finally, OSUMC medical staff improperly placed a hemodialysis catheter in White's carotid arterty, resulting in two additional procedures to correctly place such a catheter.  The catheter in White's neck would have needed to be surgically removed and placed him at an increased risk of stroke, but the medical records provided to the Court do not clearly show whether White ultimately had the procedure to remove the catheter in his carotid artery before he died.  See Dkt. # 141-14, at 11-12.  In any event, the medical records show that White was not a strong candidate for surgery to remove the catheter due to his condition, and the misplaced catheter was a potential contributing factor to White's outcome regardless of whether the removal surgery took place.

Plaintiff takes the position that COVID-19 was the sole cause of death found by the medical examiner, and she makes no argument and offers no expert evidence concerning White's treatment at OSUMC. Dkt. # 159, at 17.  Plaintiff argues that the relevant causation issue is whether a custom or policy adopted by Turn Key or the Sheriff caused White's injury in cases such as this when plaintiff's argument is based on the adequacy of medical care provided by the prison medical

facility.    However, plaintiff's arguments related to causation are based on a fundamental misunderstanding of the burdens on the parties under Rule 56.  Plaintiff has framed her arguments as disputes with the evidence offered by defendant, but she has the burden to come forward with evidence which would allow a trier of fact to rule in her favor on the essential elements of her claims.  Talley v. Time, Inc., 923 F.3d 878, 894 (10th Cir. 2019) (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137-38 (10th Cir. 2016).  Plaintiff is correct that the relevant legal causation standard for the subjective component of a deliberate indifference claim requires her to show that defendants caused White unnecessary pain or caused a worsening of his condition pursuant to an official or custom or policy.  Mata v. Saiz, 427 F.3d 745 (10th Cir. 2005).  This does not mean the Court will simply overlook obvious evidence of medical malpractice that occurred after White was taken to OSUMC if there is a factual dispute as to the medical cause of White's death.

Plaintiff has failed to come forward with expert medical evidence establishing that the allegedly inadequate medical care at the Jail was a predominant or even substantial factor in White's eventual death, even if Turn Key or Jail personnel could have taken additional measures to prevent the spread of COVID-19 at the Jail or transferred White to a hospital prior to July 19, 2021.  In § 1983 cases concerning the denial of medical care, the plaintiff's injury is ordinarily so clearly and obviously related to the inadequacy or outright denial of medical care that a layperson would be able to see a connection between the inadequate medical care and the plaintiff's injury.  See Mata v. Saiz, 427 F.3d 745, 750 (10th Cir. 2005) (inmate suffered severe and irreversible heart damage due to delay in treatment); Oxendine v. Kaplan, 241 F.3d 1272, 1277-78 (10th Cir. 2001) (inmate denied medical care after portion of his finger was severed, surgically reattached, and turned black due to

14

an infection).  Expert medical testimony is not required in such cases when the cause of the plaintiff's injury would be obvious to a layperson.  However, when there are multiple potential medical causes of the plaintiff's injury, expert medical testimony is required to meet the plaintiff's burden to show that his injury was caused by the actions of the defendant.  See Zartner v. Miller, 760 F. App'x 558, 563-64 (10th Cir. Jan. 9, 2019) ("when an injury lacks obvious origin and multiple causes are possible, expert medical testimony is necessary to prove causation between a use of force and an injury);[7] Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006) (complex medical issues with possible causes other than the lack of proper treatment by prison officials requires expert medical testimony to establish causation).  Plaintiff's entire theory of the case is that defendants delayed in sending White to the hospital, and it was the delay that caused a worsening of White's condition and subsequent death.  Dkt. # 159, at 28.  The evidence does not support such a simplistic explanation for White's death, even if the parties dispute when White should have been sent to a hospital for medical treatment.  Plaintiff is required to offer expert medical testimony to establish that COVID-19, rather than negligent treatment White received at OSUMC, caused White's death, and without expert testimony the Court finds that a layperson would not be able to determine the cause of White's death.

Defendants argue that this lack of evidence concerning the medical cause of White's death requires the Court to grant summary judgment in their favor on plaintiff's § 1983 claims.  The Court agrees that the lack of expert medical evidence bars plaintiff from arguing to a jury that defendants' actions caused White's death, but this does not necessarily dispose of all of aspects of plaintiff's §

---

[7]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

1983 claim. Plaintiff has failed come forward with evidence that would allow a jury to find that the delay in transferring White to a hospital caused his death, but she has been clear that her argument is that defendant's actions or inaction resulted in a worsening of White's condition. The Court will evaluate the evidence and determine whether plaintiff could have a potentially valid § 1983 claim up to the point of White's transfer to OSUMC and the time period shortly thereafter.[8]

### B.

Defendants argue that plaintiff cannot prevail on a deliberate indifference claim, because plaintiff has not produced any evidence suggesting that Turn Key or Jail staff acted with the subjective intent to violate White's constitutional rights. Plaintiff responds that Turn Key and the Sheriff failed to provide adequate medical care by denying inmates access to medical personnel qualified to assess their condition and by delaying referrals for emergency medical treatment.

Under § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. The elements necessary to establish a § 1983 violation "will vary based on the

---

[8]      Plaintiff has chosen to proceed under a theory that Turn Key's inadequate medical care resulted in a worsening of White's condition, The Tenth Circuit has explained that the objective element of a § 1983 claim can be satisfied by showing that a delay in medical care caused "substantial harm" to the inmate and, in some cases, substantial harm can based on "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." Paugh v. Uintah County, 47 F.4th 1139, 1155 (10th Cir. 2022). Based on plaintiff's briefing, it is possible that she could proceed with a § 1983 deliberate indifference claim under an intermediate injury theory, even though she has failed to produce sufficient evidence to establish that defendants' actions or inaction caused White's death. The Court will proceed to the subjective element of a deliberate indifference claim based on the possibility that plaintiff could establish a deliberate indifference claim under an intermediate injury theory.

constitutional provision at issue." Ashcroft, 556 U.S. 662, 676 (2009). When the defendant is a municipal entity, the "under color of state law" element of a § 1983 claim requires that the constitutional deprivation occurred pursuant to official policy or custom. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Plaintiff alleges that Turn Key violated White's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment. The Eighth Amendment "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). To establish an Eighth Amendment violation, a plaintiff must show that a prison official acted with deliberate indifference. "Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 827 (1994); Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). In Wilson v. Seiter, 501 U.S. 294 (1991), the Supreme Court clarified that deliberate indifference has two components: (1) an objective requirement that the pain or deprivation be sufficiently serious; and (2) a subjective requirement that the offending officials act with a sufficiently culpable state of mind. Wilson, 501 U.S. at 298-99. The objective component of a deliberate indifference claim focuses on the severity of the harm suffered by the inmate. Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 859 (10th Cir. 2021). "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Martinez v. Beggs, 563 F.3d 1082, 1089 (10th Cir. 2009). However, "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." Tafoya, 516 F.3d at 916

(emphasis in original).  The same standards for a deliberate indifference claim apply to pretrial detainees in state custody under the Due Process Clause of the Fourteenth Amendment.  Martinez, 563 F.3d at 1088.

Plaintiff argues that Turn Key's medical providers should have been able to appreciate the seriousness of White's medical condition when he requested medical treatment on July 13, 2021, and Otoo has acknowledged that White should have been sent to the emergency room based on his symptoms.  Dkt. # 159, at 10; Dkt. # 159-2, at 29.  Dr. Wilcox has also opined that White should have been sent to a hospital for emergency treatment based on White's condition on July 13, 2021, and he believes that the treatment provided by O'Connor was "beneath the standard of care in many different ways."  Dkt. # 159-10, at 8.  Dr. Wilcox asserts that O'Connor ignored White's abnormal vital signs and she should have at least contacted a higher level medical provider to have White evaluated for pneumonia.  Id.  He faults O'Connor's decision to use a treatment protocol for "common cold" as incorrect, and he also believes that White's symptoms warranted an immediate test for COVID-19.  Id.  Plaintiff refutes Turn Key's argument that plaintiff was adequately treated by O'Connor, and she argues that providing to White over-the-counter medication without any interaction with a physican or higher level nurse cannot be considered appropriate medical care.  Dkt. # 159, at 32-33.  Plaintiff cites Lucas v. Turn Key Health Clinics, LLC, 58 F.4th 1127 (10th Cir. 2023), for the proposition that a complete denial of care is not required in order to satisfy the subjective component of a deliberate indifference claim, and a court can infer that the provider knew of and disregarded a substantial risk of harm to an inmate in situations when the care provided is "woefully inadequate."  Dkt. # 159, at 33-34.

18

Plaintiff's argument attempts to focus on what treatment should have been provided to White, while the proper focus should be on the treatment actually provided to White, and whether the care or lack of care establishes that Turn Key medical staff subjectively knew of a substantial risk of harm to White and consciously disregarded that risk by failing to transfer him to a hospital prior to July 19, 2021. Plaintiff's expert, Dr. Wilcox, opines that White's treatment on July 13, 2021 was below the "standard of care" for multiple reasons, including the selection of an improper treatment protocol, the failure to understand the severity of White's symptoms and vital signs, the failure to order a COVID-19 test, and the lack of follow-up treatment after the examination. Dkt. # 160-10, at 8. Dr. Wilcox believes that White should have been referred to a higher level medical provider or taken to an emergency department for further evaluation based on his symptoms and vital signs, and the over-the-counter medication provided to White was not appropriate under the circumstances. These complaints about White's medical care would be appropriate for a negligence claim, but they are not by themselves enough to establish that Turn Key acted with deliberate indifference. The Tenth Circuit has recognized that the failure of a medical professional to properly treat an inmate or refer the inmate to more qualified medical personnel can give rise to a deliberate indifference claim, but "the medical professional has available the defense that [she] was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000); see also Burke v. Regalado, 935 F.3d 960, 992 (10th Cir. 2019) ("We distinguish a medical professional's negligent failure to treat a serious medical condition properly, which does not constitute deliberate indifference, from 'prison officials [who] prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment,' which may constitute deliberate indifference").

The evidence establishes that O'Connor, a nurse, evaluated White on July 13, 2021, and she testified in her deposition that White did not have difficulty walking and he was able to communicate clearly with her. Dkt. # 141-9, at 6. White was complaining of a headache and said he was a "super sick man," but he could not more clearly articulate his symptoms. Id. at 9. O'Connor's treatment notes show that White had a fever, red and itchy eyes, stuffy nose, and a productive cough. Dkt. # 141-1, at 7. O'Connor also noted that White's throat and nasal passages were inflamed, he had abnormal breathing sounds, as well as drainage coming from his ears. Id. at 8. O'Conner chose not to refer White to another provider or to an emergency room for further evaluation, and defendants' expert, Dr. Brownback opines that White would not have been admitted to an emergency room due to White's lack of hypoxemia. Dkt. # 141-2, at 7. Dr. Wilcox agrees that White may not have been admitted to an emergency room if hypoxemia were a requirement for admission. Dkt. # 141-5, at 170.

Plaintiff relies heavily on Lucas for the proposition that inadequate medical care that is obviously inadequate or deficient can be used to establish that a defendant knew of and disregarded a substantial risk of harm to a defendant. In Lucas, the plaintiff alleged that Michelle Ann Caddell was arrested in December 2018 and tested positive for chlamydia about a month later. 58 F.4th at 1134. Beginning in June 2019, Caddell complained of hip and thigh pain, vaginal discharge, and heavy bleeding. Id. Caddell was not seen by a physician until August 2019, and testing showed that the Caddell had an elevated white blood cell count and heavy e coli growth. Id. The physician gave Caddell Tylenol and proceeded to ignore her ongoing complaints of vaginal discharge and pain. Id. at 1135. In September 2019, a nurse examined Caddell and recommended that she be referred to an obstetrician. Turn Key delayed the referral for two weeks and, when Caddell did meet with an

obstetrician, it was determined that Caddell likely had invasive cervical cancer. Jail medical staff continued to deny Caddell medical treatment until she was transferred to a hospital in November 2019, and hospital physicians determined that the Caddell had stage three cervical cancer and deep vein thrombosis in her left leg. Id. Caddell later died as a result of her medical conditions, and Caddell's estate sued Turn Key, the Tulsa County Sheriff, and the Turn Key physician. The district court granted the defendants' motions to dismiss in their entirety, but the Tenth Circuit reversed the dismissal of the deliberate indifference claim against the jail physician.[9] The plaintiff's allegations supported an inference that the physician was subjectively aware of Caddell's complaints and the severity of her symptoms, and he ignored her concerns and merely provided her Tylenol for her pain. Id. at 1140. The physician could potentially be held liable under theories that he provided "woefully inadequate" treatment or that he failed to satisfy his role as a gatekeeper for more appropriate medical care. Id. at 1142-44.

Lucas is nothing like the present case in terms of the procedural posture of the case and the severity of the allegations against the prison medical provider. The Tenth Circuit was reviewing a district court ruling on motions to dismiss, and it accepted as true the allegations of the plaintiff's complaint for the purpose of ruling on the plaintiff's appeal. The Tenth Circuit merely found that the jail physician was not "insulated from liability by providing some initial modicum of care," but the case "may look different once Dr. Myers is 'given an opportunity to clarify and explain [his] actions.'" Id. at 1142. There were no definitive findings as to the liability of the jail physician, and

---

[9]     Lucas also concerns the viability of other constitutional and tort claims against the jail and medical providers, but those types of claims are not at issue in this case.

the Tenth Circuit's ruling simply allowed the case to continue to discovery for further development of the plaintiff's claims.

The more significant problem with plaintiff's <u>Lucas</u> argument is that she is merely lifting quotations from the case concerning potential bases for a deliberate indifference claim without considering the factual allegations involved in the <u>Lucas</u> case. In <u>Lucas</u>, Caddell had requested treatment beginning in June 2019, and she alleged that the jail physician and Turn Key staff ignored her requests for medical treatment for months before finally transferring her to a hospital in November 2019. The jail physician repeatedly dismissed plaintiff's objectively serious complaints of pain and gave her Tylenol, and the physician claimed that Caddell's constant requests for medical treatment "do not fulfill medical logic," even though she was suffering from cervical cancer. In this case, White was seen by nurses on at least July 13 and 19, 2021, and he was likely evaluated in some fashion by Williams on July 17, 2021. White presented with symptoms similar to an upper respiratory infection and he was treated accordingly, even if he ultimately had COVID-19 and the treatments he received were ineffective to relieve his symptoms. <u>Lucas</u> does not stand for the proposition that treatment inherently gives rise to a deliberate indifference claim merely because it turns out to be incorrect or inadequate. In <u>Lucas</u>, the Tenth Circuit reviewed the plaintiff's allegations and was able to infer that the plaintiff might be able to establish the subjective element of deliberate indifference claim through pretrial discovery. In this context of a motion for summary judgment, <u>Lucas</u> could support an argument that based on the evidence before the Court that treatment was non-existent or so "woefully inadequate" that it would be reasonable for the factfinder to conclude that Turn Key subjectively disregarded a substantial risk of harm to an inmate.

22

However, Lucas does not permit this Court to disregard the standard of review under Rule 56 and make one-sided inferences based on plaintiff's view of the evidence.

A reasonable factfinder viewing the evidence in a light most favorable to plaintiff could not review the evidence in this case and reach the conclusion that Turn Key acted with the requisite subjective intent to deny appropriate medical care to White. Plaintiff's § 1983 claim against Turn Key is based solely on arguments concerning what treatment Turn Key staff should have provided under the circumstances to satisfy an objective standard of care. On July 13, 2021, White requested medical treatment and had symptoms that were generally consistent with an upper respiratory infection, and he received over-the-counter medication pursuant to a treatment protocol prepared by a Turn Key physician. After White initially appeared for treatment on July 13, 2021, he was transferred to OSUMC for emergency treatment six days later, and he was placed on supplemental oxygen after testing positive for COVID-19. The Court notes that plaintiff complains that White may not have been given a COVID-19 test by Turn Key before he was transferred to OSUMC, but his initial COVID-19 test at OSUMC was negative before a second COVID-19 test administered by OSUMC returned a positive result. White was initially in stable condition while he received supplemental oxygen at OSUMC, and even Dr. Wilcox agrees that White was not in critical condition when he arrived at OSUMC. The Court does not disregard evidence that White was sick and in pain for the six days between July 13 and July 19, 2021. However, the evidence produced by the parties does not suggest that Turn Key staff ignored White's complaints that he was seriously ill and, to the contrary, White was promptly transferred to a hospital when his oxygen saturation levels showed that his condition was substantially deteriorating. Plaintiff has not shown that Turn Key violated White's constitutional rights by acting with deliberate indifference to his need for

medical care.  Due to plaintiff's failure to establish that he was denied constitutionally adequate medical care, plaintiff also cannot show that the Sheriff violated plaintiff's constitutional rights by failing to provide adequate medical care at the Jail or properly train detention staff in regards to inmate medical care, and summary judgment should be entered in favor of the Turn Key and the Sheriff.[10]

  **IT IS THEREFORE ORDERED** that Defendant Sheriff's Motion for Summary Judgment and Brief in Support (Dkt. # 132) and Defendant Turn Key Health Clinics, LLC's Motion for Summary Judgment and Brief in Support (Dkt. # 140) are **granted**.  A separate judgment is entered herewith.

  **IT IS FURTHER ORDERED** that Defendants' Joint Application for Contempt and Motion to Exclude Witness (Dkt. # 129), Defendant Bowling's Motions in Limine and Brief in Support (Dkt. # 181), and Motion in Limine of Defendant Turn Key Health Clinics, LLC (Dkt. # 183) are **moot**.

  **DATED** this 30th day of April, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[10] Based on the Court's ruling that defendants did not violate White's constitutional rights, it is unnecessary for the Court to reach the parties' arguments concerning the existence of an official policy or custom to provide constitutionally inadequate healthcare at the Jail.  The Court also does not reach defendants' arguments that they are immune from liability under the Public Readiness and Emergency Preparedness Act, 42 U.S.C § 247d-6d et seq.